UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| PETER FERRENDINO and JACOB KILGORE, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　　　*Plaintiffs,*<br>　　　v.<br><br>T-MOBILE US, INC. and T-MOBILE USA, INC.,<br><br>　　　　　　　　　　*Defendants.* | Case No.<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiffs Peter Ferrendino and Jacob Kilgore, on behalf of themselves and all others similarly situated, assert the following against Defendants T-Mobile US, Inc. and T-Mobile USA, Inc., ("Defendants" or "T-Mobile"), based upon personal knowledge, where applicable, information and belief, and the investigation of counsel.

**INTRODUCTION**

1.　　　Plaintiffs' personally identifiable information ("PII") was exfiltrated and compromised in the data breach announced by T-Mobile on January 19, 2023 (the "Data Breach").

2.　　　T-Mobile is one of the largest consumer brands in the United States and collects vast quantities of personal information from its customers.

3.　　　T-Mobile has touted its superior technology to persuade consumers to purchase its services. T-Mobile states that it "is the leader in 5G," offering 5G download speeds, upload speeds, and availability, among other things. T-Mobile's efforts have resulted in wireless coverage that reaches over a hundred million people.

4.      T-Mobile assures its customers that it uses "administrative, technical, contractual, and physical safeguards designed to protect [customers'] data while it is under [T-Mobile's] control."

5.      T-Mobile's CEO insists that "[k]eeping [T-Mobile] customers' data safe is a responsibility we take incredibly seriously" and that preventing data breaches "has always been a top priority of [T-Mobile's]."

6.      T-Mobile's Privacy Policy likewise acknowledges that its consumers "trust T-Mobile to connect [them] to the world every day," that "[a] big part of that is maintaining [their] privacy," and that they "deserve transparency, education, choice, protection, and simplicity."

7.      However, as evidenced by the Data Breach—the latest in a long series of similar breaches—T-Mobile failed to meet these obligations and protect sensitive consumer data.

8.      Plaintiffs bring this Class Action Complaint for T-Mobile's failure to protect their information systems that contain PII and their failure to provide timely and adequate notice to Plaintiffs and other Class Members that their PII had been compromised.

9.      The Data Breach was a direct result of T-Mobile's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect Plaintiffs' and Class Members' PII.

10.     Plaintiffs, individually and on behalf of all others similarly situated, bring claims for negligence, negligence *per se*, breach of contract, breach of implied contract, unjust enrichment, invasion of privacy – intrusion upon seclusion, the Ohio Consumer Sales Practices Act, the Ohio Deceptive Trade Practices Act, the Pennsylvania Unfair Trade Practices and Consumer Protection Law, and the Declaratory Judgment Act.

11.     Plaintiffs seek, among other things, damages and injunctive relief requiring T-Mobile to fully and accurately disclose the PII and other information that has been compromised; to adopt reasonably sufficient security practices and safeguards to protect Plaintiffs' and Class Members' PII from unauthorized disclosures in order to prevent incidents like the Data Breach from reoccurring in the future, and to safeguard the PII that remains in T-Mobile's custody.

12.     Plaintiffs further seek an Order requiring T-Mobile to: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members for ten (10) years, as Plaintiffs and Class Members are at risk and will continue to be at an increased risk of identity theft due to the unauthorized disclosure of their PII as a result of T-Mobile's conduct described herein.

13.     Given that little information relating to the Data Breach, including which systems were impacted, has yet been revealed to the public, Plaintiffs anticipate additional support for their claims will be uncovered following a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C § 1332(d), because the amount in controversy for the Class and Subclass exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative members of the Class and Subclass defined below, and a significant portion of putative Class and Subclass Members are citizens of a different state than Defendants.

15.     This Court has specific personal jurisdiction over T-Mobile because the Plaintiffs' claims arise out of or relate to T-Mobile's contacts with this District. T-Mobile has intentionally

created extensive contacts with Missouri through its deliberate marketing and sales of its services in the forum.

16.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), (c), and (d) because T-Mobile transacts business in this District.

## PARTIES

17.     Plaintiff Peter Ferrendino ("Plaintiff Ferrendino") is a citizen and resident of the Commonwealth of Pennsylvania.

18.     Plaintiff Ferrendino was notified by text, email, and/or upon logging into his T-Mobile account of the Data Breach and the impact to his PII.

19.     Plaintiff Ferrendino's PII was disclosed without his authorization to unknown third parties as a result of the Data Breach.

20.     As a result of the Data Breach, Plaintiff Ferrendino spent time and effort researching the Data Breach and reviewing and monitoring his accounts for fraudulent activity, has changed his pin, and has been in frequent communication with T-Mobile.

21.     Additionally, Plaintiff Ferrendino believes he may have been victim of a SIM swap[1] as friends would receive calls from his number but were not from him.

22.     Plaintiff Ferrendino places significant value in the security of his PII. Plaintiff Ferrendino entrusted his PII to T-Mobile with the understanding that T-Mobile would keep his information secure and employ reasonable and adequate security measures to ensure that it would not be compromised.

---

[1] The practice of SIM Swapping, explained at ¶46, *infra*, occurs when cybercriminals contact a wireless carrier and use stolen PII to pass themselves off as an account holder, then ask that their phone number be transferred to a new SIM card, which gives them access to not only the wireless number and account, but also any two-factor authentication codes that might come to the phone via text message.

23.     As a result of T-Mobile's failure to adequately protect the sensitive information entrusted to it, Plaintiff Ferrendino and Class Members suffered actual damages including, without limitation, time related to monitoring their accounts for fraudulent activity, exposure to increased and imminent risk of fraud and identity theft, the loss in value of his personal information, and other economic and non-economic harm. Plaintiff Ferrendino and Class Members will now be forced to expend additional time to review their credit reports and monitor their accounts for fraud or identify theft.

24.     As a result of the Data Breach, Plaintiff Ferrendino has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Data Breach.

**Plaintiff Kilgore**

25.     Plaintiff Jacob Kilgore ("Plaintiff Kilgore") is a citizen and resident of the State of Ohio.

26.     Plaintiff Kilgore was notified by text, email, and/or upon logging into his T-Mobile account of the Data Breach and the impact to his PII.

27.     Plaintiff Kilgore's PII was disclosed without his authorization to unknown third parties as a result of the Data Breach.

28.     As a result of the Data Breach, Plaintiff Kilgore spent considerable time and effort researching the Data Breach and reviewing and monitoring his accounts for fraudulent activity and changing his passwords.

29.     Plaintiff Kilgore places significant value in the security of his PII. Plaintiff Kilgore entrusted his PII to T-Mobile with the understanding that T-Mobile would keep his

information secure and employ reasonable and adequate security measures to ensure that it would not be compromised.

30.     As a result of T-Mobile's failure to adequately protect the sensitive information entrusted to it, Plaintiff Kilgore and Class Members suffered actual damages including, without limitation, time related to monitoring their accounts for fraudulent activity, exposure to increased and imminent risk of fraud and identity theft, the loss in value of his personal information, and other economic and non-economic harm. Plaintiff Kilgore and Class Members will now be forced to expend additional time to review their credit reports and monitor their accounts for fraud or identify theft.

31.     As a result of the Data Breach, Plaintiff Kilgore has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Data Breach.

32.     Defendant T-Mobile US, Inc. and its wholly owned subsidiary Defendant T-Mobile USA, Inc. ("Defendants" or "T-Mobile") are a telecommunications company that provides wireless, messaging, and data services along with mobile phones and accessories.

33.     T-Mobile's headquarters are located at 12920 SE 38th Street, Bellevue, Washington, 98006, and they are incorporated under the laws of Delaware.

34.     T-Mobile was entrusted with and was in possession of Plaintiff's PII.

## FACTUAL ALLEGATIONS

### I.     THE DATA BREACH

35.     On January 19, 2023, T-Mobile announced in a U.S. Securities and Exchange Commission ("SEC") Form 8-K ("SEC 8-K") filing that a "bad actor" had compromised the PII

of "approximately 37 million current postpaid and prepaid customer accounts" "without authorization."

36.     Although T-Mobile has released very little public information about the Data Breach, their SEC 8-K stated that their customers' PII was compromised through an "Application Programming Interface" ("API"). APIs are instructions that allow applications to access data and interact with web databases and, if left improperly secured, APIs can be leveraged by malicious actors to mass-harvest information stored in those databases.

37.     Upon detection of the Data Breach, T-Mobile's SEC 8-K stated the company "promptly commenced an investigation with external cybersecurity experts," and "within a day of learning of the malicious activity, we were able to trace the source of the malicious activity and stop it," asserting that "the malicious activity appears to be fully contained at this time."

38.     T-Mobile's SEC 8-K revealed that it believes "the bad actor first retrieved data through the impacted API starting on or around November 25, 2022," and that it failed to detect the unauthorized activity until January 5, 2023.

39.     Jake Williams, an analyst at the Institute for Applied Network Security in Massachusetts, stated about the most recent Data Breach, that "the bottom line" is that T-Mobile's failure to detect the breach for approximately six weeks indicates that "T-Mobile's API security clearly needs work"—as it "shouldn't be having mass API abuse for more than six weeks."

40.     Chester Wisniewski, field chief technical officer of applied research at the security firm Sophos, opined that it was "concerning that the criminals were in T-Mobile's system for more than a month before being discovered," as this "suggests T-Mobile's defenses do

not utilize modern security monitoring and threat hunting teams, as you might expect to find in a large enterprise like a mobile network operator."

41.    According to T-Mobile's SEC 8-K, the types of PII compromised in this Data Breach include, but are not limited to: "name, billing address, email, phone number, date of birth, T-Mobile account number and information such as the number of lines on the account and plan features."

## II.    T-MOBILE FAILED TO PROVIDE ADEQUATE NOTICE

42.    T-Mobile's SEC 8-K stated the company has "notified certain federal agencies about the incident" and has "begun notifying customers whose information may have been obtained by the bad actor in accordance with applicable state and federal requirements."

43.    However, the data breach notices sent to and received by victims of the Data Breach, including Plaintiffs, are woefully deficient. Instead of warning Data Breach victims that they are at significant risk of identity theft and fraud, the notice by T-Mobile states that T-Mobile "prevented the most sensitive types of customer information from being accessed," and that "[c]ustomer accounts and finances are not put directly at risk by this event."

44.    T-Mobile's January 19, 2023 press release announcing the Data Breach further downplayed the value of what was stolen, stating that it believed "[n]o passwords, payment card information, social security numbers, government ID numbers or other financial account information were compromised" and asserting that "no information was obtained for impacted customers that would compromise the safety of customer accounts or finances," and that "customer accounts and finances should not be put at risk directly by this event."

45.    These statements are highly misleading, as the PII compromised in the Data Breach significantly increases the risk of identity theft and fraud for victims. For example,

Chester Wisniewski at Sophos stated "[t]he information stolen in this breach is ideal for ***SIM swapping attacks*** and other forms of identity theft," which "should be another reason for T-Mobile customers to lock down their accounts and move away from SMS-based multifactor authentication" for their accounts. (emphasis added).

46.     Here, Data Breach victims, including Plaintiffs, are at significant risk of "SIM swapping attacks," where cybercriminals contact a wireless carrier and use stolen PII to pass themselves off as an account holder, then ask that their phone number be transferred to a new SIM card, which gives them access to not only the wireless number and account, but also any two-factor authentication codes that might come to the phone via text message.

47.     Justin Fier, senior vice president at the security company Darktrace, stated that such massive consumer profiles could be of use to everyone from nation-state hackers to criminal syndicates: "There are dozens of ways that the information that was stolen could be weaponized…there's a bigger possibility they'll be targeted by scammers, possibly impersonating T-Mobile, either by phone or email…[and] with key tidbits of information like account numbers, those scammers will sound much more convincing."

48.     Data security researcher Brian Krebs, from the leading data privacy blog *Krebs on Security*, stated that "if the past is any teacher much of [the compromised data] will wind up posted online soon," and "[i]t is a safe bet that scammers will use some of this information to target T-Mobile users with phishing messages, account takeovers and harassment."

49.     For this reason, Krebs goes onto say, that "T-Mobile customers should fully expect to see phishers taking advantage of public concern over the breach to impersonate the company—and possibly even send messages that include the recipient's compromised account details to make the communications look more legitimate." Similarly, Krebs has said, "[d]ata

stolen and exposed in this breach may also be used for identity theft," including SIM swap attacks, because "[m]any online services allow users to reset their passwords just by clicking a link sent via SMS," as mobile phone numbers have become "de facto identity documents." According to Krebs, this in turn results in "losing control over your phone number thanks to an unauthorized SIM swap."

50.     T-Mobile's notification efforts to Plaintiffs and Class Members fell woefully short of providing crucial information about the Data Breach. These notification efforts consisted of brief messages with little substantive information that failed to warn victims to take action to protect themselves from identity theft and fraud. These notification efforts caused the harm suffered by Plaintiffs and Class Members, by failing to timely provide them with the necessary details about the Data Breach.

## III.     T-MOBILE'S HISTORY OF DATA BREACHES

51.     This Data Breach is directly attributable to T-Mobile's repeated history of security failures. Data breaches have now become an annual event for T-Mobile the last several years. This particular Data Breach is at least T-Mobile's *eighth* data breach since 2017.

52.     In 2017, Karan Saini, a security researcher, found a "bug" on a T-Mobile website that allowed hackers to access PII such as email addresses, account numbers, and IMSI numbers, just by knowing or guessing a customer's phone number. According to Saini, T-Mobile had 76 million customers, and an attacker could have run a script to scrape the data (email, name, billing account number, IMSI number, other numbers under the same account which are usually family members) from all 76 million of these customers to create a searchable database with accurate and up-to-date information of all users, making every T-Mobile cell phone owner a victim. T-Mobile had no mechanism in place to prevent this type of critical data breach.  According to a

hacker, the "bug" had been exploited by multiple hackers over a multi-week period before it was discovered by Saini. The hackers who found the "bug" before Saini even uploaded a tutorial on how to exploit it on YouTube.

53.     In 2018, hackers gained access to T-Mobile servers and stole the PII of roughly two million T-Mobile customers. The stolen PII included names, email addresses, account numbers, other billing information, and encrypted passwords. T-Mobile misleadingly downplayed the hack, claiming that no passwords were "compromised," when in reality hackers stole millions of encrypted passwords that were likely decrypted by the hackers due to the weak encoding algorithm employed by T-Mobile, leading security experts to advise affected customers to assume their passwords were cracked and change them as a result.

54.     In 2019, hackers accessed the PII of roughly 1 million T-Mobile prepaid customers. The PII included names, phone numbers, addresses, account information, and rate, plan, and calling features.

55.     In March 2020, T-Mobile disclosed it was subject to a data breach that exposed customer and employee PII, including names, addresses, social security numbers, financial account information, government identification numbers, phone numbers, and billing account information.

56.     Later in 2020, T-Mobile suffered yet another data breach in which hackers accessed T-Mobile's customer proprietary network information ("CPNI") and undisclosed call-related information for hundreds of thousands of customers.

57.     In August 2021, reports emerged that T-Mobile had suffered one of the largest data breaches in history, in which cybercriminals exploited T-Mobile's data security protocols and gained access to internal servers containing the PII of approximately 76.6 million current,

former, and prospective T-Mobile customers—including names, addresses, dates of birth, driver's license numbers, Social Security Numbers, phone numbers, and unique technical identifiers tethered to customers' mobile phones—exfiltrating a purported 106 GB of this data and posting a subset of the stolen PII for sale on the "dark web."

58.    In December 2021, T-Mobile disclosed that several customers had experienced SIM swap attacks, stating: "We informed a very small number of customers that the SIM card assigned to a mobile number on their account may have been illegally reassigned or limited account information was viewed."

59.    Further, in April 2022 it was announced that members of the "LAPSUS$" cybercrime group breached T-Mobile multiple times in March, stealing source code for a range of company projects and accessing employee accounts with access to an internal T-Mobile tool for managing customer accounts.

60.    As Chester Wisniewski at Sophos stated about the most recent Data Breach, "I'm certainly disappointed to hear that, after as many breaches as they've had, they still haven't been able to shore up their leaky ship," deadpanning "[a]nother day, another T-Mobile breach."

61.    Similarly, Neil Mack, senior analyst for Moody's Investors Service, stated "[w]hile these cybersecurity breaches may not be systemic in nature, their frequency of occurrence at T-Mobile is an alarming outlier relative to telecom peers," noting that this Data Breach raises serious questions about T-Mobile's security practices and cyber governance.

62.    Given the numerous data breaches pre-dating this Data Breach, T-Mobile was clearly on notice and aware of its data security failures. The fact that subsequent data breaches have occurred reinforces that Plaintiffs' PII, which remains in T-Mobile's possession, is not safe.

63.    T-Mobile is a publicly traded company and the second largest wireless carrier in the United States, with over 100 million current subscribers.

64.    T-Mobile's Privacy Policy, available on its website, states that it applies "to personal data we have about you," meaning data that "identifies, relates to, describes, can be associated with, or could reasonably identify you as an individual." This includes "data like your name, address, or email address, as well as less obvious data like demographic data, device and usage data, call records, advertising ID, and location data[.]"

65.    The Privacy Policy further states that it applies to "all personal data we collect and use when you access or use our cell and data services, websites, apps, and other services (our 'services'), purchase and use our devices and products ('products'), visit our retail stores, or communicate or interact with us in any way."

66.    T-Mobile's Privacy Policy provides customers with detailed promises regarding the treatment of their PII, including how T-Mobile uses customers' data for its own benefit and profit. For example, T-Mobile confirms that it uses customers' personal data to "[a]dvertise and market products and services from T-Mobile and other companies to you, including through targeted advertising and communications about promotions and events, contents, and sweepstakes"; and to "[c]onduct research and create reports from analysis of things like usage patterns and trends and deidentify or aggregate personal data to create business and market analysis and reports."

67.    T-Mobile agreed that it would only share data under certain circumstances, which include: "***with your consent or at your direction,*" "*with the account holder*,**" "between T-Mobile brands and companies," "to provide benefits," "to our service providers," "to other third

parties . . . for uses described in this notice or for purposes you have requested," "for identity verification and fraud prevention services," "caller ID providers," "in a business transfer or transaction" which is specified as a "corporate business transaction like an acquisition, divestiture, sale of company assets," and "for legal process and protection." (emphasis added).

68.     None of the enumerated circumstances involve sharing Plaintiffs' or the Class Members' PII with hackers and cyber criminals.

69.     After limiting the ways it would share PII and also listing the ways T-Mobile benefits and profits from tracking and targeting its customers and non-customers through collecting and maintaining their valuable PII, T-Mobile's Privacy Policy pledges to them that their PII is secure, stating that: (i) personal data will be disclosed only "***with your consent, which we may get in writing, online, or orally***," and (ii) T-Mobile uses "***administrative, technical, contractual, and physical safeguards designed to protect your data***." (emphasis added).

70.     As discussed herein, T-Mobile failed to comply with these Privacy Policy promises to protect Plaintiffs' and Class Members' PII.

71.     T-Mobile's acknowledges that consumers "***trust T-Mobile to connect you to the world every day, and we're working hard to earn a place in your heart. A big part of that is maintaining your privacy. We believe you deserve transparency, education, choice, protection, and simplicity***." (emphasis added). These are empty promises for the millions of consumers affected by T-Mobile's most recent Data Breach.

## V.     T-MOBILE FAILED TO COMPLY WITH DATA SECURITY INDUSTRY STANDARDS

72.     T-Mobile is well-aware of the importance of safeguarding Plaintiffs' and Class Members' PIII, that by virtue of their business—a wireless carrier who collects PII—they place Plaintiffs' and Class Members' PII at risk of being targeted by cybercriminals.

73. Thus, T-Mobile is aware that the PII that they collect, organize, and store, can be used by cybercriminals to engage in crimes such as identity fraud and theft using Plaintiffs' and Class Members' PII.

74. Because T-Mobile failed to implement, maintain, and comply with necessary cybersecurity requirements, as a result, T-Mobile was unable to protect Plaintiffs' and Class Members' information and confidentiality, and protect against obvious and readily foreseeable threats to information, security, and confidentiality.

75. As a proximate result of such failures, cybercriminals gained unauthorized access to T-Mobile's network and acquired Plaintiffs' and Class Members' PII in the Data Breach without being stopped.

76. T-Mobile was unable to prevent the Data Breach and was unable to detect the unauthorized access to vast quantities of sensitive and protected files containing Plaintiffs' and Class Members' PII.

77. Commonly accepted data security standards among businesses that store personal information, such as the PII involved here, include, but are not limited to: maintaining a secure firewall configuration; monitoring for suspicious or irregular traffic to servers; monitoring for suspicious credentials used to access servers; monitoring for suspicious or irregular activity by known users; monitoring for suspicious or unknown users; monitoring for suspicious or irregular server requests; monitoring for server requests for personal and financial information; monitoring for server requests from VPNs; and monitoring for server requests from Tor exit nodes.

78. Based upon the known details of the Data Breach and how it occurred, T-Mobile also failed to fully comply with industry-standard cybersecurity practices, ncluding, but not

limited to, proper firewall configuration, network segmentation, secure credential storage, rate limiting, user-activity monitoring, data-loss prevention, and intrusion detection and prevention.

79.     The U.S. Federal Trade Commission ("FTC") publishes guides for businesses on Cybersecurity (*Start with Security: A Guide for Business*, (June 2015)) and protection of personal and financial information (*Protecting Personal Information: A Guide for Business*, (Oct. 2016))[2], which includes basic security standards applicable to all types of businesses.

80.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

81.     Because T-Mobile were entrusted with Plaintiffs' and Class Members' PII, they had and continue to have a duty to keep the PII secure.

82.     Plaintiffs and Class Members reasonably expect that when they entrust their PII to T-Mobile they will safeguard their information.

83.     Despite T-Mobile's obligations, T-Mobile failed to appropriately monitor and maintain their data security systems in a meaningful way so as to prevent the Data Breach.

84.     Had T-Mobile properly maintained their systems and adequately protected them, they could have prevented the Data Breach.

_____

## VI.   T-MOBILE VIOLATED THEIR COMMON LAW DUTY OF REASONABLE CARE

85.   T-Mobile was aware of the importance of security in maintaining personal information (particularly sensitive personal information like the PII involved here), and the value consumers place on keeping their PII secure.

86.   In addition to obligations imposed by Federal and State law, T-Mobile owed and continues to owe a common law duty to Plaintiffs and Class Members—who entrusted T-Mobile with their PII—to exercise reasonable care in receiving, maintaining, and storing the PII in T-Mobile's possession.

87.   T-Mobile owed and continues to owe a duty to prevent Plaintiffs' and Class Members' PII from being compromised, accessed, lost, stolen, or misused by unauthorized third parties. An essential part of T-Mobile's duty was (and is) the obligation to provide reasonable security, consistent with current industry best practices and requirements, and to ensure that their information technology systems and networks, in addition to the personnel responsible for those systems and networks, were adequately protecting and continue to protect Plaintiffs' and Class Members' PII.

88.   T-Mobile owed a duty to Plaintiffs and Class Members, who entrusted T-Mobile with extremely sensitive PII to design, maintain, and test the information technology systems that housed Plaintiffs' and Class Members' PII, to ensure that the PII in T-Mobile's possession was adequately secured and protected.

89.   T-Mobile owed a duty to Plaintiffs and Class Members to create, implement, and maintain reasonable data security practices and procedures sufficient to protect the PII stored in T-Mobile's systems. In addition, this duty also required T-Mobile to adequately train its employees and others with access to Plaintiffs' and Class Members' PII on the procedures and

practices necessary to safeguard such sensitive information. This duty also required supervision, training, and compliance on T-Mobile's part to ensure that it complied with creating, implementing, and maintaining reasonable data security practices and procedures sufficient to protect Plaintiffs' and Class Members' PII.

90.     T-Mobile owed a duty to Plaintiffs and Class Members to implement processes that would enable T-Mobile to timely detect a breach of its information technology systems, and a duty to act upon any data security warnings or red flags detected by such systems in a timely fashion.

91.     T-Mobile owed a duty to Plaintiffs and Class Members to disclose when and if their information technology systems and data security practices were not sufficiently adequate to protect and safeguard Plaintiffs' and Class Members' PII.

92.     T-Mobile owed a duty to Plaintiffs and Class Members to timely and adequately disclose the fact that a data breach, resulting in unauthorized access to their PII, had occurred.

93.     T-Mobile breached these duties.

94.     T-Mobile failed to publicly describe the full extent of the Data Breach and notify affected parties. This demonstrates that T-Mobile did not properly implement measures designed to timely detect a data breach of their information technology systems, as required to adequately safeguard Plaintiffs' and Class Members' PII.

95.     T-Mobile also breached their duty to create, implement, and maintain reasonable data security practices and procedures sufficient to protect Plaintiffs' and Class Members' PII.

# VII. THE VALUE OF PRIVATE INFORMATION AND EFFECTS OF UNAUTHORIZED DISCLOSURE

96.     T-Mobile was well aware that the protected PII it acquires, stores, and utilizes is highly sensitive and of significant value to the owners of the PII and to those who would use it for wrongful purposes.

97.     PII is a valuable commodity to identity thieves, particularly when it is aggregated in large numbers. Former United States Attorney General William P. Barr made clear that consumers' sensitive personal information commonly stolen in data breaches "has economic value." The purpose of stealing large caches of personal data is to use it to defraud individuals or to place it for illegal sale and to profit from other criminals who buy the data and use it to commit fraud and identity theft. Indeed, cybercriminals routinely post stolen personal information on anonymous websites, making the information widely available to a criminal underworld.

98.     There is an active and robust market for this information. As John Sancenito, president of Information Network Associates, a company which helps companies with recovery after data breaches, explained after a data breach "[m]ost of the time what [data breach hackers] do is they steal the data and then they sell the data on the dark web to the people who actually commit the fraud."

99.     The ramifications of T-Mobile's failure to keep Plaintiffs' and Class Members' PII secure are long lasting and severe. To avoid detection, identity thieves often hold stolen data for months or years before using it. Also, the sale of stolen information on the "dark web" may take months or more to reach end-users, in part because the data is often sold in small batches as opposed to in bulk to a single buyer. Thus, Plaintiffs and Class Members must vigilantly monitor their accounts *ad infinitum*.

100. Thus, T-Mobile knew, or should have known, the importance of safeguarding the PII entrusted to it and of the foreseeable consequences if its systems were breached. T-Mobile failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

101. As a highly sophisticated party that handles sensitive PII, T-Mobile failed to establish and/or implement appropriate administrative, technical and/or physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class Members' PII to protect against anticipated threats of intrusion of such information.

102. Identity thieves use stolen PII for various types of criminal activities, such as when personal information is used to commit fraud or other crimes, including credit card fraud, phone or utilities fraud, bank fraud and government fraud.

103. The PII exfiltrated in the Data Breach can also be used to commit identity theft by placing Plaintiffs and Class Members at a higher risk of "phishing," "vishing," "smishing," and "pharming," which are other ways for cybercriminals to exploit information they already have in order to get even more personally identifying information from a person through unsolicited email, text messages, and telephone calls purportedly from a legitimate company requesting personal, financial, and/or login credentials.

104. There is often a lag time between when fraud occurs versus when it is discovered, as well as between when PII is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web,

fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."

105.    Personal information is such a valuable commodity to identity thieves that, once the information has been compromised, criminals often trade the information on the cyber black market (i.e., the "dark web") for years.

106.    Plaintiffs and Class Members rightfully place a high value not only on their PII, but also on the privacy of that data.

107.    Thus, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

108.    Data breaches are preventable. As Lucy Thompson wrote in the *Data Breach and Encryption Handbook*, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions." She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised…" and "[m]ost of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures…Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."

## VIII.    T-MOBILE FAILED TO COMPLY WITH THE FTC ACT

109.    T-Mobile is prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45, from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and

appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

110.    T-Mobile's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice that violates the FTC Act.

111.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices.  According to the FTC, the need for data security should be factored into all business decision-making.

112.    In 2007, the FTC published guidelines establishing reasonable data security practices for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems. The guidelines also recommend that businesses consider using an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone may be trying to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

113.    The FTC has also published a document entitled "FTC Facts for Business," which highlights the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.

114.    T-Mobile is aware of and failed to follow the FTC guidelines and failed to adequately secure PII.

115.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act.  Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

116.    T-Mobile failed to properly implement basic data security practices.  T-Mobile's failure to employ reasonable and appropriate measures to protect against unauthorized access to consumer PII, or to prevent the disclosure of such information to unauthorized individuals constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

117.    T-Mobile was at all times fully aware of their obligations to protect the PII of consumers because of its business of obtaining, collecting, and storing PII.  T-Mobile was also aware of the significant repercussions that would result from their failure to do so.

IX.    **THE DATA BREACH DAMAGED PLAINTIFFS AND CLASS MEMBERS**

118.    The ramifications of T-Mobile's failure to keep PII secure are long-lasting and severe. Victims of data breaches are more likely to become victims of identity fraud.  In 2019 alone, consumers lost more than $1.9 billion to identity theft and fraud according to FTC data analysis.

119.    Plaintiffs and Class Members have faced a substantial and imminent risk of identity theft and fraud as a result of the Data Breach.  Unauthorized third parties carried out the Data Breach and stole the personal information of Plaintiffs and Class Members with the intent to use it for fraudulent purposes and/or sell it to other cybercriminals.

120.    The risk of identity theft is particularly substantial when the PII compromised is unique to a specific individual, as it is here.

121.     Plaintiffs and Class Members have spent and will continue to spend substantial amounts of time monitoring their accounts for identity theft and fraud, the opening of fraudulent accounts, disputing fraudulent transactions, and reviewing their financial affairs more closely than they otherwise would have done but for the Data Breach. These efforts are burdensome and time-consuming, especially because T-Mobile has failed to disclose the full extent of when the breach occurred or how long it lasted, forcing customers to continue to monitor their accounts indefinitely.

122.     Many Class Members will also incur out of pocket costs for protective measures such as identity theft protection, credit monitoring fees, credit report fees, credit freeze fees, fees for replacement cards, and similar costs related to the Data Breach.

123.     Plaintiffs and Class Members now face years of constant surveillance of their personal records, monitoring, and loss of rights.  Plaintiffs and the Class are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

124.     Plaintiffs and Class Members are now at heightened risk for "SIM swapping." Customers often request SIM swaps for legitimate reasons when they obtain new phones or switch mobile carriers. However, T-Mobile does not have adequate protections in place to prevent fraudulent SIM swap attacks from occurring, and the particular data released in the Data Breach makes it much more likely that a T-Mobile customer, such as Plaintiffs and Class Members, will become a victim of a SIM swap attack.

125.     In a fraudulent SIM swap, a would-be hacker contacts T-Mobile and impersonates the legitimate customer. This impersonation is made substantially easier when directed at T-Mobile customers, because hackers now have access to data about T-Mobile customers,

including their names, billing addresses, email, phone numbers, dates of birth, account number, information such as the number of lines on the account and plan features.

126.    Following a fraudulent SIM swap the subscriber (now victim)'s phone loses connection to the network, and they cannot use their network to call, text, or use the internet, and they are inhibited in their attempts to warn their wireless carrier of the fraud. Subsequently all phone calls and text messages that would normally have gone to the victim's phone now go to the fraudsters' phone.

127.    If the fraudster has even one other data point, such as an email address, they can often use the phone number to get into the victim's email account through the forgotten password feature, or by using the victim's legitimate phone number to pass *two-factor authentication*.

128.    Because customer email addresses were compromised in the Data Breach (and connected to a T-Mobile customer account), this data is now readily available to SIM swap hackers.

129.    Given T-Mobile's failure to protect Plaintiffs' and the Class Members' PII despite multiple data breaches in the past, Plaintiffs have a significant and cognizable interest in obtaining injunctive and equitable relief (in addition to any monetary damages, restitution, or disgorgement) that protects them from suffering further harm, as their PII remains in T-Mobile's possession.

130.    As a result of T-Mobile's failure to prevent the Data Breach, Plaintiffs and Class Members have suffered and will continue to suffer injuries, loss of time and productivity through efforts to ameliorate, mitigate, and deal with the future consequences of the Data Breach; theft of their valuable PII; the imminent and certainly impeding injury flowing from fraud and identity theft posed by their PII being disclosed to unauthorized recipients and cybercriminals; damages

to and diminution in value of their PII; and continued risk to Plaintiffs' and the Class Members' PII, which remains in the possession of T-Mobile and which is subject to further breaches so long as T-Mobile fails to undertake appropriate and adequate measures to protect the PII which it was entrusted.

131.    In the case of a data breach, merely reimbursing a consumer for a financial loss due to identity theft or fraud does not make that individual whole again. On the contrary, after conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems."

132.    Plaintiffs and Class Members also suffered a "loss of value" of their sensitive personal information when it was stolen by a hacker in the Data Breach. A robust market exists for stolen personal information. Hackers sell personal information on the dark web—an underground market for illicit activity, including the purchase of hacked personal information— at specific identifiable prices.

133.    Plaintiffs and Class Members also suffered "benefit of the bargain" damages. Plaintiffs and Class Members overpaid for services that should have been—but were not— accompanied by adequate data security. Part of the charges and fees Plaintiffs and Class Members paid to T-Mobile were intended to be used to fund adequate data security. Plaintiffs and Class Members did not get what they paid for.

134.    Class Members who experience actual identity theft and fraud will also be harmed by the inability to use their credit or debit cards when their accounts are suspended or otherwise rendered unusable due to fraudulent charges. To the extent Class Members are charged monthly/annual fees for their credit and/or debit accounts, they are left without the benefit of that

bargain while they await receipt of their replacement cards. Class Members will be harmed further by the loss of rewards points or airline mileage that they cannot accrue while awaiting replacement cards. The inability to use payment cards may also result in missed payments on bills and loans, late charges and fees, and adverse effects on their credit, including decreased credit scores and adverse credit notations.

135.     A victim whose personal information has been stolen or compromised may not see the full extent of identity theft or fraud until long after the initial breach. Additionally, a victim whose PII has been stolen may not become aware of charges when they are nominal, as typical fraud-prevention algorithms may not capture such charges. Those charges may be repeated, over and over again, on a victim's account.

136.     The risk of identity theft and fraud will persist for years. Identity thieves often hold stolen data for months or years before using it to avoid detection. Also, the sale of stolen information on the dark web may take months or more to reach end-users, in part because the data is often sold in small batches to various individuals rather than in bulk to a single buyer. Thus, Plaintiffs and Class Members must vigilantly monitor their financial accounts *ad infinitum*.

## CLASS ACTION ALLEGATIONS

137.     Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), (b)(3), and (c)(4) on behalf of the following Nationwide Class:

> All persons in the United States whose personal information was compromised in the Data Breach made public by T-Mobile on January 19, 2023 ("Nationwide Class").

138.     Excluded from the Nationwide Class are T-Mobile, their subsidiaries and affiliates, their officers, directors and members of their immediate families and any entity in which T-Mobile have a controlling interest, the legal representative, heirs, successors, or assigns

of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

139.     Plaintiffs reserve the right to modify, expand, or amend the above Nationwide Class definition or to seek certification of a class or classes defined differently than above before any court determine whether certification is appropriate following discover.

## OHIO SUBCLASS

140.     Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and (b)(3) on behalf of the following Ohio Subclass:

> All persons in Ohio whose personal information was compromised in the Data Breach made public by T-Mobile on January 19, 2023 (the "Ohio Subclass").

141.     Excluded from the Ohio Subclass are T-Mobile, their subsidiaries and affiliates, their officers, directors and members of their immediate families and any entity in which T-Mobile have a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

142.     Plaintiffs reserve the right to modify, expand or amend the above Ohio Subclass definition or to seek certification of a class or classes defined differently than above before any court determines whether certification is appropriate following discovery.

## PENNSYLVANIA SUBCLASS

143.     Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and (b)(3) on behalf of the following Pennsylvania Subclass:

> All persons in Pennsylvania whose personal information was compromised in the Data Breach made public by T-Mobile on January 19, 2023 (the "Pennsylvania Subclass").

144.    Excluded from the Rhode Island Subclass are T-Mobile, their subsidiaries and affiliates, their officers, directors and members of their immediate families and any entity in which T-Mobile have a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

145.    Plaintiffs reserve the right to modify, expand or amend the above Pennsylvania Subclass definition or to seek certification of a class or classes defined differently than above before any court determines whether certification is appropriate following discovery.

146.    Certification of Plaintiffs' claims for class-wide treatment are appropriate because all elements of Fed. R. Civ. P. 23(a), (b)(2)-(3), and (c)(4) are satisfied. Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

147.    **Numerosity:** All requirements of Fed. R. Civ. P. 23(a)(1) are satisfied. The Members of the Nationwide Class are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, T-Mobile has acknowledged that millions of individuals' PII has been compromised in this Data Breach. Class Members may be identified through objective means. Class Members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

148.    **Commonality and Predominance:** All requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) are satisfied. This action involves common questions of law and fact, which

predominate over any questions affecting individual Class Members, including, without limitation:

   a. Whether T-Mobile engaged in active misfeasance and misconduct alleged herein;

   b. Whether T-Mobile owed a duty to Class Members to safeguard their sensitive personal information;

   c. Whether T-Mobile breached its duty to Class Members to safeguard their sensitive personal information;

   d. Whether T-Mobile knew or should have known that its data security systems and monitoring processes were deficient;

   e. Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of the Data Breach;

   f. Whether T-Mobile's failure to provide adequate security proximately caused Plaintiffs' and Class Members' injuries; and

   g. Whether Plaintiffs and Class Members are entitled to declaratory and injunctive relief.

149. **Typicality:** All requirements of Fed. R. Civ. P. 23(a)(3) are satisfied. Plaintiffs' claims are typical of the claims of all Class Members because Plaintiffs, like other Class Members and Subclass Members, suffered theft of their sensitive personal information in the Data Breach.

150. **Adequacy of Representation:** All requirements of Fed. R. Civ. P. 23(a)(4) are satisfied. Plaintiffs are adequate Class representatives because they are Members of the Clases and State Subclasses and their interests do not conflict with the interests of other Class and

Subclass Members that they seeks to represent. Plaintiffs are committed to pursuing this matter for the Class with the Class's collective best interest in mind. Plaintiffs have retained counsel competent and experienced in complex class action litigation of this type and Plaintiffs intend to prosecute this action vigorously. Plaintiffs, and their counsel, will fairly and adequately protect the Class's interests.

151.    **Predominance and Superiority:** All requirements of Fed. R. Civ. P. 23(b)(3) are satisfied. As described above, common issues of law or fact predominate over individual issues. Resolution of those common issues in Plaintiffs' case will also resolve them for the Class's claims. In addition, a class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against T-Mobile, so it would be impracticable for Members of the Class to individually seek redress for T-Mobile's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

152.    **Cohesiveness:** All requirements of Fed. R. Civ. P. 23(b)(2) are satisfied. T-Mobile has acted, or refused to act, on grounds generally applicable to the Nationwide Class and State Subclasses such that final declaratory or injunctive relief is appropriate.

153.	Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.	Whether T-Mobile owed a legal duty to Plaintiffs and the Classes to exercise due care in collecting, storing, using, and safeguarding their PII;

    b.	Whether T-Mobile's data security practices were reasonable in light of best practices recommended by data security experts;

    c.	Whether T-Mobile's failure to institute adequate protective security measures amounted to negligence;

    d.	Whether T-Mobile failed to take commercially reasonable steps to safeguard consumer PII; and

    e.	Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

154.	Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on newly learned facts or legal developments that arise following additional investigation, discovery, or otherwise.

# CLAIMS FOR RELIEF

## COUNT I

### NEGLIGENCE
**(On behalf of Plaintiffs and the Nationwide Class, or alternatively, Plaintiffs the State Subclasses)**

155.    Plaintiffs reallege and incorporate by reference all preceding allegations as if fully set forth herein.

156.    T-Mobile obtained Plaintiffs' and Class Members' sensitive personal information in connection with Plaintiffs and Class Members signing up for T-Mobile's wireless services.

157.    By collecting and maintaining sensitive personal information, T-Mobile had a common law duty of care to use reasonable means to secure and safeguard the sensitive personal information and to prevent disclosure of the information to unauthorized individuals. T-Mobile's duty included a responsibility to implement processes by which it could detect a data breach of this type and magnitude in a timely manner.

158.    T-Mobile owed a duty of care to Plaintiffs and Class Members to provide data security consistent with the various statutory requirements, regulations, and other notices described above.

159.    T-Mobile's duty of care arose as a result of, among other things, the special relationship that existed between T-Mobile and its customers. T-Mobile was the only party in a position to ensure that its systems were sufficient to protect against the foreseeable risk that a data breach could occur that would result in substantial harm to consumers.

160.    T-Mobile was subject to an "independent duty" untethered to any contract between Plaintiffs and Class Members and T-Mobile.

161.     T-Mobile breached its duties, and thus was negligent, by failing to use reasonable measures to protect customers' sensitive personal information. T-Mobile's negligent acts and omissions include, but are not limited to, the following:

      a.   failure to employ systems and educate employees to protect against malware;

      b.   failure to comply with industry standards for software and server security;

      c.   failure to track and monitor access to its network and personal information;

      d.   failure to limit access to those with a valid purpose;

      e.   failure to adequately staff and fund its data security operation;

      f.   failure to remove, delete, or destroy highly sensitive personal information of consumers that is no longer being used for any valid business purpose;

      g.   failure to use due care in hiring, promoting, and supervising those responsible for its data security operations; and

      h.   failure to recognize a hacker was stealing personal information from its network while the Data Breach was taking place.

162.     It was foreseeable to T-Mobile that a failure to use reasonable measures to protect its customers' sensitive personal information could result in injury to consumers. Further, actual and attempted breaches of data security were reasonably foreseeable to T-Mobile given the known frequency of data breaches and various warnings from industry experts. Indeed, the Data Breach was foreseeable to T-Mobile as it suffered numerous breaches in the years preceding the Data Breach, yet it failed to rectify its deficient data security.

163.     As a direct and proximate result of T-Mobile's negligence, Plaintiffs and Class Members are entitled to all damages, including compensatory, consequential, punitive, and/or nominal damages, in an amount to be proven at trial.

164.     Plaintiffs and Class Members are also entitled to injunctive relief requiring T-Mobile to, among other things: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members for ten (10) years.

## COUNT II

### NEGLIGENCE *PER SE*

**(On behalf of Plaintiffs and the Nationwide Class, or alternatively, Plaintiffs the State Subclasses)**

165.     Plaintiffs reallege and incorporate all previous allegations as though fully set forth herein.

166.     T-Mobile is liable for negligence *per se* for their violation of the FTC Act, 15 U.S.C. § 45.

167.     As alleged above, pursuant to the Section 5 of FTC Act, 15 U.S.C. § 45, T-Mobile had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' sensitive personal information.

168.     Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the failure to use reasonable measures to protect sensitive personal information. The FTC publications and orders described above also form part of the basis of T-Mobile's duty.

169.     T-Mobile violated Section 5 of the FTC Act by failing to use reasonable measures to protect sensitive personal information and comply with applicable industry standards,

including the FTC Act, as described in detail herein. T-Mobile's conduct was particularly unreasonable given the nature and amount of sensitive personal information it collected and stored and the foreseeable consequences of a data breach, including specifically, as described herein, the damages that would result to consumers.

170. T-Mobile's services related to the protection of sensitive personal information of its customers is activity that falls outside the provision of common carrier services.

171. Plaintiffs and Class Members are within the class of persons that Section 5 of the FTC Act was intended to protect, because the FTC Act was expressly designed to protect consumers from "substantial injury."

172. The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and Class Members.

173. T-Mobile had a duty to Plaintiffs and Class Members to implement and maintain reasonable security procedures and practices to safeguard Plaintiffs' and Class Members' sensitive personal information.

174. T-Mobile breached its duties to Plaintiffs and Class Members under the FTC Act, by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' sensitive personal information.

175. T-Mobile's violation of Section 5 of the FTC Act and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

176. But for T-Mobile's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured, or would not have been injured to as great a degree.

177. The injury suffered by Plaintiffs and Class Members was a reasonably foreseeable result of T-Mobile's breach of its duties. T-Mobile knew or should have known that the breach of its duties would cause Plaintiffs and Class Members to suffer the foreseeable harms associated with the exposure of their sensitive personal information.

178. As a direct and proximate result of T-Mobile's negligence *per se*, Plaintiffs and Class Members sustained damages as alleged herein. Plaintiffs and Class Members are entitled to all damages, including compensatory, consequential, punitive, and/or nominal damages, in an amount to be proven at trial.

179. Plaintiffs and Class Members are also entitled to injunctive relief requiring T-Mobile to, among other things: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members for ten (10) years.

### COUNT III

**BREACH OF CONTRACT**
**(On behalf of Plaintiffs and the Nationwide Class, or alternatively, Plaintiffs the State Subclasses)**

180. Plaintiffs reallege and incorporate by reference all preceding allegations as if fully set forth herein.

181. T-Mobile's Privacy Notice is an agreement between T-Mobile and individuals who provided their PII to T-Mobile, including Plaintiffs and Class Members.

182. T-Mobile's Privacy Notice states that it applies "to personal data we have about you," meaning "data that identifies, relates to, describes, can be associated with, or could reasonably identify you as an individual." This includes "data like your name, address, or email address, as well as less obvious data like demographic data, device and usage data, call records, advertising ID, and location data[.]" It further states that the Notice applies to "all personal data we collect and use when you access or use our cell and data services, websites, apps, and other services (our 'services'), purchase and use our devices and products ('products'), visit our retail stores, or communicate or interact with us in any way."

183. T-Mobile's Privacy Notice stated at the time of the Data Breach that T-Mobile "use[s] administrative, technical, contractual, and physical safeguards designed to protect your data while it is under our control."

184. T-Mobile further agreed at the time of the Data Breach that it would only share data under certain enumerated circumstances, which include: "with your consent or at your direction," "with the account holder," "between T-Mobile brands and companies," "to provide benefits," "to our service providers," "to other third parties . . . for uses described in this notice or for purposes you have requested," "for identity verification and fraud prevention services," "caller ID providers," "in a business transfer or transaction" which is specified as a "corporate business transaction like an acquisition, divestiture, sale of company assets," and "for legal process and protection."

185. None of the enumerated circumstances involve sharing Plaintiffs' or the Class Members' PII with a criminal hacker.

186. T-Mobile emphasized in its Privacy Policy at the time of the Data Breach that those who provide their PII to T-Mobile "trust T-Mobile to connect you to the world every day,

and we're working hard to earn a place in your heart. A big part of that is maintaining your privacy. We believe you deserve transparency, education, choice, protection, and simplicity."

187.    Plaintiffs and Class Members and T-Mobile formed a contract when Plaintiffs and Class Members obtained products or services from T-Mobile, or otherwise provided PII to T-Mobile subject to its Privacy Policy.

188.    Plaintiffs and Class Members fully performed their obligations under the contracts with T-Mobile by providing their PII.

189.    T-Mobile breached its agreement with Plaintiffs and Class Members by failing to protect their PII. Specifically, it (1) failed to take reasonable steps to use safe and secure systems to protect that information; and (2) disclosed that information to unauthorized third parties, in violation of the agreement.

190.    As a direct and proximate result of T-Mobile's breach of contract, Plaintiffs and Class Members sustained damages as alleged herein. Plaintiffs and Class Members are entitled to all damages, including compensatory, consequential, punitive, and/or nominal damages, in an amount to be proven at trial.

191.    Plaintiffs and Class Members are also entitled to injunctive relief requiring T-Mobile to, among other things: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members for ten (10) years.

## COUNT IV

### BREACH OF IMPLIED CONTRACT
**(On behalf of Plaintiffs and the Nationwide Class, or alternatively, Plaintiffs the State Subclasses)**

192.     Plaintiffs reallege and incorporate by reference all preceding allegations as if fully set forth herein.

193.     When Plaintiffs and Class Members provided their sensitive personal information to T-Mobile in exchange for T-Mobile's services, they entered into implied contracts with T-Mobile under which T-Mobile agreed to take reasonable steps to protect their sensitive personal information.

194.     T-Mobile solicited and invited Plaintiffs and Class Members to provide their sensitive personal information as part of T-Mobile's regular business practices. Indeed, in order to sign up for many of T-Mobiles services, T-Mobile requires customers to provide personal information sufficient for T-Mobile to check the customer's credit score to obtain T-Mobile's services. Plaintiffs and Class Members accepted T-Mobile's offers and provided their sensitive personal information T-Mobile.

195.     When entering into the implied contracts, Plaintiffs and Class Members reasonably believed and expected that T-Mobile's data security practices complied with relevant laws, regulations, and industry standards.

196.     Plaintiffs and Class Members paid money to T-Mobile to purchase T-Mobile's services. Plaintiffs and Class Members reasonably believed and expected that T-Mobile would use part of those funds to obtain adequate data security. T-Mobile failed to do so.

197.     Plaintiffs and Class Members would not have provided their sensitive personal information to T-Mobile in the absence of T-Mobile's implied promise to keep their sensitive personal information reasonably secure.

198.     Plaintiffs and Class Members fully performed their obligations under the implied contracts by paying money to T-Mobile.

199.     T-Mobile breached its implied contracts with Plaintiffs and Class Members by failing to implement reasonable data security measures.

200.     As a direct and proximate result of T-Mobile's breach of implied contract, Plaintiffs and Class Members sustained damages as alleged herein. Plaintiffs and Class Members are entitled to all damages, including compensatory, consequential, punitive, and/or nominal damages, in an amount to be proven at trial.

201.     Plaintiffs and Class Members are also entitled to injunctive relief requiring T-Mobile to, among other things: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members for ten (10) years.

## COUNT V

### UNJUST ENRICHMENT
**(On behalf of Plaintiffs and the Nationwide Class, or alternatively, Plaintiffs the State Subclasses)**

202.     Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

203.     Plaintiffs and Class Members conferred a monetary benefit upon T-Mobile in the form of monies paid for the purchase of items on T-Mobile.

204.     T-Mobile appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and Class Members. T-Mobile also benefited from the receipt of Plaintiffs' and Class Members' sensitive personal information as this was utilized by T-Mobile to check Plaintiffs' and Class Members' credit score, send bills, and process payments for services, among other things.

205.     The monies Plaintiffs and Class Members paid to T-Mobile were supposed to be used by T-Mobile, in part, to pay for adequate data privacy infrastructure, practices, and procedures.

206.     As a result of T-Mobile's conduct, Plaintiffs and Class Members suffered actual damages in an amount equal to the difference in value between what they paid for (T-Mobile's services made with adequate data privacy and security practices and procedures), and what they actually received (T-Mobile's services without adequate data privacy and security practices and procedures).

207.     In equity and good conscience, T-Mobile should not be permitted to retain the money belonging to Plaintiffs and Class Members because T-Mobile failed to implement, or adequately implement, the data privacy and security practices and procedures that Plaintiffs and Class Members paid for and that were otherwise mandated by Federal, State, and local laws and industry standards.

208.     T-Mobile is therefore liable to Plaintiffs and Class Members for restitution or disgorgement in the amount of the benefit conferred on T-Mobile as a result of its wrongful conduct, including specifically: the value to T-Mobile of the PII that was stolen in the Data Breach; the profits T-Mobile received and is receiving from the use of that information; the amounts that T-Mobile overcharged Plaintiffs and Class Members for use of T-Mobile's products

and services; and the amounts that T-Mobile should have spent to provide reasonable and adequate data security to protect Plaintiffs' and Class Members' PII.

209.    T-Mobile should be compelled to disgorge into a common fund for the benefit of Plaintiffs' and Class Members all unlawful or inequitable proceeds received by it as a result of the conduct and Data Breach alleged herein.

## COUNT VI

### BREACH OF CONFIDENCE
**(On behalf of Plaintiffs and the Nationwide Class, or alternatively, Plaintiffs the State Subclasses)**

210.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

211.    Plaintiffs and Class Members maintained a confidential relationship with T-Mobile whereby T-Mobile undertook a duty not to disclose to unauthorized parties the PII provided by Plaintiffs and Class Members to T-Mobile to unauthorized third parties. Such PII was confidential and novel, highly personal and sensitive, and not generally known.

212.    T-Mobile knew Plaintiffs' and Class Members' PII was being disclosed in confidence and understood the confidence was to be maintained, including by expressly and implicitly agreeing to protect the confidentiality and security of the PII they collected, stored, and maintained.

213.    As a result of the Data Breach, there was an unauthorized disclosure of Plaintiffs' and Class Members' PII in violation of this understanding. The unauthorized disclosure occurred because T-Mobile failed to implement and maintain reasonable safeguards to protect the PII in its possession and failed to comply with industry-standard data security practices.

214.    Plaintiffs and Class Members were harmed by way of an unconsented disclosure of their confidential information to an unauthorized third party.

215.     But for T-Mobile's disclosure of Plaintiffs' and Class Members' PII in violation of the parties' understanding of confidence, their PII would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. T-Mobile's Data Breach was the direct and legal cause of the theft of Plaintiffs' and Class Members' PII, as well as the resulting damages.

216.     The injury and harm Plaintiffs and Class Members suffered was the reasonably foreseeable result of T-Mobile's unauthorized disclosure of Plaintiffs' and Class Members' PII. T-Mobile knew its computer systems and technologies for accepting, securing, and storing Plaintiffs' and Class Members' PII had serious security vulnerabilities because T-Mobile failed to observe even basic information security practices or correct known security vulnerabilities.

217.     As a direct and proximate result of T-Mobile's breach of confidence, Plaintiffs and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost value of access to their PII permitted by T-Mobile; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of T-Mobile's Data

Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

<u>COUNT VII</u>

**INVASION OF PRIVACY – INTRUSION UPON SECLUSION**
**(On behalf of Plaintiffs and the Nationwide Class, or alternatively, Plaintiffs the State Subclasses)**

218.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

219.    Plaintiffs shared PII with T-Mobile that Plaintiffs wanted to remain private and non-public.

220.    Plaintiffs reasonably expected that the PII they shared with T-Mobile would be protected and secured against access by unauthorized parties and would not be disclosed to or obtained by unauthorized parties, or disclosed or obtained for any improper purpose.

221.    T-Mobile intentionally intruded into Plaintiffs' and Class Members' seclusion by disclosing without permission their PII to a third party who then sold their PII to other third-parties on the dark web.

222.    By failing to keep Plaintiffs' and Class Members' PII secure, and disclosing PII to unauthorized parties for unauthorized use, T-Mobile unlawfully invaded Plaintiffs' and Class Members' privacy right to seclusion by, *inter alia*:

  a.  intruding into their private affairs in a manner that would be highly offensive to a reasonable person;

  b.  invading their privacy by improperly using their PII properly obtained for specific purpose for another purpose, or disclosing it to unauthorized persons;

c.  failing to adequately secure their PII from disclosure to unauthorized persons; and

d.  enabling the disclosure of their PII without consent.

223.    The PII that was publicized during the Data Breach was highly sensitive, private, and confidential, as it included Social Security numbers and other PII.

224.    T-Mobile's intrusions into Plaintiffs' and Class Members' seclusion were substantial and would be highly offensive to a reasonable person, constituting an egregious breach of social norms.

225.    As a direct and proximate result of T-Mobile's invasions of privacy, Plaintiffs and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost value of access to their PII permitted by T-Mobile; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of T-Mobile's Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

**COUNT VIII**

**OHIO CONSUMER SALES PRACTICES ACT,**
**Ohio Rev. Code §§ 1345.01, *et seq.***
**(On behalf of Plaintiff Kilgore and the Ohio Subclass)**

226.    Plaintiff Kilgore individually and on behalf of the Ohio Subclass, repeats and realleges the above allegations as if fully set forth herein.

227.    T-Mobile, Plaintiff Kilgore and each member of the Ohio Subclass are "persons," as defined by Ohio Rev. Code § 1345.01(B).

228.    T-Mobile was a "supplier" engaged in "consumer transactions," as defined by Ohio Rev. Code §§ 1345.01(A) & (C).

229.    T-Mobile advertised, offered, or sold goods or services in Ohio and engaged in trade or commerce directly or indirectly affecting the people of Ohio.

230.    T-Mobile engaged in unfair and deceptive acts and practices in connection with a consumer transaction, in violation of Ohio Rev. Code § 1345.02, including:

        a.    Representing that the subject of a transaction had approval, performance characteristics, uses, and benefits that it did not have;

        b.    Representing that the subject of a transaction were of a particular standard or quality when they were not.

231.    T-Mobile engaged in unconscionable acts and practices in connection with a consumer transaction, in violation of Ohio Rev. Code § 1345.03, including:

        a.    Knowingly taking advantage of the inability of Plaintiff Kilgore and the members of the Ohio Subclass to reasonably protect their interest because of their ignorance of the issues discussed herein;

b. Knowing at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction;

c. Requiring the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the supplier;

d. Knowingly making a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment.

232. T-Mobile's unfair, deceptive, and unconscionable acts and practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Kilgore's and members of the Ohio Subclass' PII, which was a direct and proximate cause of the Data Breach;

b. Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Kilgore's and members of the Ohio Subclass' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiff Kilgore's and members of the Ohio Subclass' PII, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff Kilgore's and members of the Ohio Subclass' PII; and

g. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Kilgore's and members of the Ohio Subclass' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45.

233. T-Mobile's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of T-Mobile's data security and ability to protect the confidentiality of consumers' PII.

234. T-Mobile intended to mislead Plaintiff and members of the Ohio Subclass and induce them to rely on its misrepresentations and omissions.

235. T-Mobile acted intentionally, knowingly, and maliciously to violate Ohio's Consumer Sales Practices Act, and recklessly disregarded Plaintiff Kilgore's and members of the Ohio Subclass' rights. T-Mobile's numerous past data breaches put it on notice that its security and privacy protections were inadequate.

236. T-Mobile's unfair, deceptive, and unconscionable acts and practices complained of herein affected the public interest, including the many Ohioans affected by the T-Mobile Data Breach.

237.     As a direct and proximate result of T-Mobile's unfair, deceptive, and unconscionable acts and practices, Plaintiff Kilgore's and members of the Ohio Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their PII; overpayment for T-Mobile's services; loss of the value of access to their PII; and the value of identity protection services made necessary by the Breach.

238.     Plaintiff Kilgore's and members of the Ohio Subclass seek all monetary and non-monetary relief allowed by law, including declaratory and injunctive relief, the greater of actual and treble damages or statutory damages, attorneys' fees and costs, and any other appropriate relief.

## COUNT XXVII

**OHIO DECEPTIVE TRADE PRACTICES ACT,**
**Ohio Rev. Code §§ 4165.01, *et seq.***
**(On behalf of Plaintiff Kilgore and the Ohio Subclass)**

239.     Plaintiff Kilgore, individually and on behalf of the Ohio Subclass, repeats and realleges the above allegations as if fully set forth herein.

240.     T-Mobile, Plaintiff Kilgore, and each member of the Ohio Subclass are a "person," as defined by Ohio Rev. Code § 4165.01(D).

241.     T-Mobile advertised, offered, or sold goods or services in Ohio and engaged in trade or commerce directly or indirectly affecting the people of Ohio.

242.     T-Mobile engaged in deceptive trade practices in the course of its business and vocation, in violation of Ohio Rev. Code § 4165.02, including:

a. Representing that its goods and services have approval, characteristics, uses, or benefits that they do not have;

b. Representing that its goods and services are of a particular standard or quality when they are of another;

c. Advertising its goods and services with intent not to sell them as advertise.

243. T-Mobile's deceptive trade practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Kilgore's and members of the Ohio Subclass' PII, which was a direct and proximate cause of the Data Breach;

b. Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Kilgore's and members of the Ohio Subclass' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiff Kilgore's and members of the Ohio Subclass' PII, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Kilgore's and

members of the Ohio Subclass' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45;

 f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff Kilgore's and members of the Ohio Subclass' PII; and

 g. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Kilgore's and members of the Ohio Subclass' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45.

244. T-Mobile's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of T-Mobile's data security and ability to protect the confidentiality of consumers' PII.

245. T-Mobile intended to mislead Plaintiff Kilgore and members of the Ohio Subclass and induce them to rely on its misrepresentations and omissions.

246. T-Mobile acted intentionally, knowingly, and maliciously to violate Ohio's Deceptive Trade Practices Act, and recklessly disregarded Plaintiff Kilgore's and members of the Ohio Subclass' rights. T-Mobile's numerous past data breaches put it on notice that its security and privacy protections were inadequate.

247. As a direct and proximate result of T-Mobile's deceptive trade practices, Plaintiff Kilgore and members of the Ohio Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of

fraud and identity theft; loss of value of their PII; overpayment for T-Mobile's services; loss of the value of access to their PII; and the value of identity protection services made necessary by the Breach.

248.    Plaintiff Kilgore's and members of the Ohio Subclass seek all monetary and non-monetary relief allowed by law, including injunctive relief, actual damages, attorneys' fees, and any other relief that is just and proper.

## COUNT IX

**PENNSYLVANIA UNFAIR TRADE PRACTICES AND
CONSUMER PROTECTION LAW
73 Pa. Cons. Stat. §§ 201-2 & 201-2, *et seq.*
(On behalf of Plaintiff Ferrendino and the Pennsylvania Subclass)**

249.    Plaintiff Ferrendino individually and on behalf of the Pennsylvania Subclass, repeats and realleges the above allegations as if fully set forth herein.

250.    T-Mobile is a "person", as meant by 73 Pa. Cons. Stat. § 201-2(2).

251.    Plaintiff Ferrendino and the Pennsylvania Subclass purchased goods and services in "trade" and "commerce," as meant by 73 Pa. Cons. Stat. § 201-2(3), primarily for personal, family, and/or household purposes.

252.    T-Mobile engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of its trade and commerce in violation of 73 Pa. Cons. Stat. Ann. § 201-3, including the following:

    a.    Representing that its goods and services have approval, characteristics, uses, or benefits that they do not have (73 Pa. Stat. Ann. § 201-2(4)(v));

    b.    Representing that its goods and services are of a particular standard or quality if they are another (73 Pa. Stat. Ann. § 201- 2(4)(vii)); and

    c. Advertising its goods and services with intent not to sell them as advertised (73 Pa. Stat. Ann. § 201-2(4)(ix)).

253. T-Mobile's unfair or deceptive acts and practices include:

    a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Ferrendino and the Pennsylvania Subclass' Private Information, which was a direct and proximate cause of the Data Breach;

    b. Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

    c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Ferrendino's and the Pennsylvania Subclass' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

    d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiff Ferrendino's and the Pennsylvania Subclass' Private Information, including by implementing and maintaining reasonable security measures;

    e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Ferrendino's and the Pennsylvania Subclass' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff Ferrendino's and the Pennsylvania Subclass' Private Information; and

g. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Ferrendino's and the Pennsylvania Subclass' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

254.    T-Mobile's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of T-Mobile's data security and ability to protect the confidentiality of consumers' Private Information.

255.    T-Mobile intended to mislead Plaintiff Ferrendino and the Pennsylvania Subclass and induce them to rely on its misrepresentations and omissions.

256.    Had T-Mobile disclosed to Plaintiff Ferrendino and the Pennsylvania Subclass that its data systems were not secure and, thus, vulnerable to attack, T-Mobile would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. T-Mobile was trusted with sensitive and valuable PII regarding millions of consumers, including Plaintiff Ferrendino and the Pennsylvania Subclass. T-Mobile accepted the responsibility of protecting the data while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiff Ferrendino and the Pennsylvania Subclass acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

257. T-Mobile acted intentionally, knowingly, and maliciously to violate Pennsylvania Unfair Trade Practices and Consumer Protection Law, and recklessly disregarded Plaintiff Ferrendino's and the Pennsylvania Subclass' rights.

258. As a direct and proximate result of T-Mobile's unfair methods of competition and unfair or deceptive acts or practices and Plaintiff Ferrendino's and the Pennsylvania Subclass' reliance on them, Plaintiff Ferrendino and the Pennsylvania Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their PII; overpayment for Defendant's services; loss of the value of access to their PII; and the value of identity protection services made necessary by the Data Breach.

259. Plaintiff Ferrendino the Pennsylvania Subclass seek all monetary and non-monetary relief allowed by law, including, pursuant to 73 Pa. Stat. Ann. § 201-9.2, actual damages or statutory damages of $100 (whichever is greater), treble damages, attorneys' fees and costs, and any additional relief the Court deems necessary or proper.

## COUNT X

### DECLARATORY AND INJUNCTIVE RELIEF
**(On behalf of the Nationwide Class, or alternatively, the State Subclasses)**

260. Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

261. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant

further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the statutes described in this Complaint.

262. An actual controversy has arisen in the wake of the Data Breach regarding T-Mobile's present and prospective common law and statutory duties to reasonably safeguard its customers' sensitive personal information and whether T-Mobile is currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches. Plaintiffs allege that T-Mobile's data security practices remain inadequate.

263. Plaintiffs and Class Members continue to suffer injury as a result of the compromise of their sensitive personal information and remain at imminent risk that further compromises of their personal information will occur in the future.

264. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that T-Mobile continues to owe a legal duty to secure consumers' sensitive personal information; to timely notify consumers of any data breach; and to establish and implement data security measures that are adequate to secure customers' sensitive personal information.

265. The court also should issue corresponding prospective injunctive relief requiring T-Mobile to employ adequate security protocols consistent with law and industry standards to protect consumers' sensitive personal information.

266. If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, for which they lack an adequate legal remedy. The threat of another data breach is real, immediate, and substantial. If another breach at T-Mobile occurs (which has already happened), Plaintiffs and Class Members will not have an adequate remedy at law, because not all of the

resulting injuries are readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

267. The hardship to Plaintiffs and Class Members if an injunction does not issue greatly exceeds the hardship to T-Mobile if an injunction is issued. If another data breach occurs at T-Mobile, Plaintiffs and Class Members will likely be subjected to substantial identify theft and other damages. On the other hand, the cost to T-Mobile of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and T-Mobile has a pre-existing legal obligation to employ such measures.

268. Issuance of the requested injunction will serve the public interest by preventing another data breach at T-Mobile, thus eliminating the additional injuries that would result to Plaintiffs and the millions of consumers whose confidential information would be further compromised.

## RELIEF REQUESTED

Plaintiffs, on behalf of all others similarly situated, request that the Court enter judgment against T-Mobile including the following:

A. Determining that this matter may proceed as a class action and certifying the Classes asserted herein;

B. Appointing Plaintiffs as representative of the applicable Classes and appointing Plaintiffs' counsel as Class Counsel;

C. An award to Plaintiffs and the Classes of compensatory, consequential, statutory, restitutionary, nominal, and treble damages as set forth above;

D. Injunctive relief as described herein;

E. Entering a declaratory judgment stating that T-Mobile owes a legal duty to secure consumers' sensitive personal information, to timely notify consumers of any data

breach, and to establish and implement data security measures that are adequate to secure customers' sensitive personal information;

F.      An award of attorneys' fees, costs, and expenses, as provided by law or equity;

G.      An award of pre-judgment and post-judgment interest, as provided by law or equity; and

H.      Such other relief as the Court may allow.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all issues so triable.

DATED:        June 16, 2023                    Respectfully submitted,
                                               By:  /s/ Tim E. Dollar

                                               Tim E. Dollar, MO Bar #: 33123

                                               **DOLLAR BURNS BECKER**
                                               **& HERSHEWE, L.C.**
                                               1100 Main Street, Suite 2600
                                               Kansas City, MO 64105
                                               Telephone: (816) 876-2600
                                               Facsimile: (816) 221-8763
                                               Email: timd@dollar-law.com

                                               Ronald A. Marron (175650)
                                               Alexis M. Wood (270200)
                                               Kas L. Gallucci (288709)
                                               LAW OFFICES OF RONALD A. MARRON
                                               651 Arroyo Drive
                                               San Diego, CA 92103
                                               Tel: (619) 696-9006
                                               Fax: (619) 564-6665
                                               ron@consumersadvocates.com
                                               alexis@consumersadvocates.com
                                               kas@consumersadvocates.com

                                               Margaret MacLean (*pro hac forthcoming*)
                                               Christian Levis (*pro hac forthcoming*)
                                               Amanda Fiorilla (*pro hac forthcoming*)
                                               LOWEY DANNENBERG, P.C.
                                               44 South Broadway, Suite 1100
                                               White Plains, NY 10601

Telephone:    (914) 997-0500
Facsimile:    (914) 997-0035
mmaclean@lowey.com
clevis@lowey.com
afiorilla@lowey.com

Anthony M. Christina (*pro hac forthcoming*)
LOWEY DANNENBERG, P.C.
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Telephone:    (215) 399-4770
Facsimile:     (914) 997-0035
achristina@lowey.com

Ian W. Sloss (*pro hac forthcoming*)
Brett Burgs (*pro hac forthcoming*)
SILVER GOLUB & TEITELL LLP
One Landmark Square, Floor 15
Stamford, Connecticut 06901
Telephone:    (203) 325-4491
Facsimile:     (203) 325-3769
isloss@sgtlaw.com
bburgs@sglaw.com

Timothy J. Peter (*pro hac forthcoming*)
FARUQI & FARUQI, LLP
1617 JFK Boulevard, Suite 1550
Philadelphia, PA 19103
Telephone: (215) 277-5770
Facsimile: (215) 277-5771
tpeter@faruqilaw.com
Attorneys for Plaintiff

*Attorneys for Plaintiffs and the Proposed Classes*

JS 44 (Rev 09/10)

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI

## CIVIL COVER SHEET

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Western District of Missouri.

**The completed cover sheet must be saved as a pdf document and filed as an attachment to the Complaint or Notice of Removal.**

**Plaintiff(s):**

First Listed Plaintiff:
Peter Ferrendino ;
2 Citizen of Another State; Pennsylvania
**County of Residence:** Outside This
District

Additional Plaintiff(s):
Jacob Kilgore ;
2 Citizen of Another State; Ohio

**Defendant(s):**

First Listed Defendant:
T-Mobile US, Inc. ;
5 Incorporated and Principal Place of Business in Another State; Washington
**County of Residence:** Outside This District

Additional Defendants(s):
T-Mobile USA, Inc. ;
5 Incorporated and Principal Place of Business in Another State; Washington

**County Where Claim For Relief Arose:** Jackson County

**Plaintiff's Attorney(s):**

Tim Dollar (Peter Ferrendino)
DOLLAR BURNS BECKER &
HERSHEWE, L.C.
1100 Main Street, Suite 2600
Kansas City, Missouri 64105
**Phone:** 816-876-2600
**Fax:** 816-221-8763
**Email:** timd@dollar-law.com

**Defendant's Attorney(s):**

**Basis of Jurisdiction:** 4. Diversity of Citizenship

**Citizenship of Principal Parties** (Diversity Cases Only)

    **Plaintiff:** 2 Citizen of Another State

    **Defendant:** 5 Incorporated and Principal Place of Business in Another State

**Origin:** 1. Original Proceeding

            190 Other Contract

**Nature of Suit:**

**Cause of Action:** 28 U.S.C. § 1332(d); class action for negligent handling of personal information; and breach of contract

**Requested in Complaint**

    **Class Action:** Class Action Under FRCP23

    **Monetary Demand (in Thousands):** 5,000,000

    **Jury Demand:** Yes

    **Related Cases:** Is NOT a refiling of a previously dismissed action

---

**Signature:** Tim Dollar

**Date:** 06/16/2023

If any of this information is incorrect, please close this window and go back to the Civil Cover Sheet Input form to make the correction and generate the updated JS44. Once corrected, print this form, sign and date it, and submit it with your new civil action.